## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| EDWARD HADDIX on behalf of himself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>KONINKLIJKE PHILIPS N.V.; PHILIPS NORTH AMERICA LLC; and PHILIPS RS NORTH AMERICA LLC,<br><br>*Defendants*. | Civil Action No.: **2:21-cv-00481**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff EDWARD HADDIX ("Plaintiff" or Haddix), on behalf of himself and all others similarly situated brings this complaint against Defendants Koninklijke Philips N.V. ("Royal Philips"), Philips North America LLC ("Philips NA"), and Philips RS North America LLC ("Philips RS") (collectively, Royal Philips, Philips NA, and Philips RS are "Philips" or the "Defendants"), and alleges upon on personal knowledge, the investigation of counsel, and information and belief as follows:

## NATURE OF THE ACTION

1.    This action relates to Continuous Positive Airway Pressure (CPAP) and Bi-Level Positive Airway Pressure (Bi-Level PAP) devices and mechanical ventilators manufactured by Philips, which contain polyester-based polyurethane sound abatement foam ("PE-PUR Foam").

2.    This is a class action lawsuit bought and used by Plaintiff and others similarly situated against Defendants who designed, manufactured, advertised, marketed, distributed, and sold non-invasive devices designed to help people breath.  These CPAP and BiPAP machines ("Devices" or "Recalled Devices") include:

- E30;

- DreamStation ASV;

- DreamStation ST, AVAPS;

- SystemOne ASV4;

- C Series ASV, S/T, AVAPS;

- OmniLab Advanced Plus;

- SystemOne (Q series);

- DreamStation, CPAP, Auto CPAP, BiPAP;

- DreamStation GO CPAP, APAP;

- Dorma 400, 500 CPAP;

- REMStar SE Auto CPAP;

- Trilogy 100 and 200;

- Garbin Plus, Aeris Life Vent;

- A-series BiPAP Hybrid A30;

- A-series BiPAP V30 Auto;

- A-series BiPAP A40; and

- A-series BiPAP A30.

3.    CPAP and BiPAP machines are commonly used to treat sleep apnea and other breathing disorder.  The devices are designed to express air into a patient's airway and are used as need, including potentially on a daily basis.

4.    On April 26, 2021, Philips made a public announcement disclosing it had determined there were potential health risks associated with its CPAP, BiPAP and mechanical ventilator devices related to the sound abatement foam contained within the devices, specifically that the foam may degrade or off-gas under certain circumstances. Philips announced that the

analysis of the potential health risks was ongoing, and that further information would be provided.

5.      On June 14, 2021, Defendants issued a recall in the United States of many of its CPAP, Bi-Level PAP, and mechanical ventilator devices.  The June 14, 2021 announcement stated that the Recalled Devices contain PE-PUR Foam for the purpose of sound abatement, that this type of foam may degrade, and/or off-gas particles and carcinogenic chemicals, which are in turn ingested or inhaled by the user.  Philips stated that "these issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment."

6.      Defendants have indicated that the absence of visible particles in the Recalled Devices does not mean that PE-PUR Foam breakdown has not already begun.

7.      Defendants have stated that lab analysis of the degraded foam reveals the presence of harmful chemicals, including: Toluene Diamine ("TDA"), Toluene Diisocyanate ("TDI"), and Diethylene Glycol ("DEG").

8.      Defendants knew about the substantial health hazards in connection with the PE-PUR foam used in the Recalled Devices long before the June 14, 2021 recall.  For years, patients had complained about the presence of black debris/particles within the airpath circuit of its devices (extending from the device outlet, humidifier, tubing, and mask), about a persistent smell while using the devices, and other health conditions including but not limited to complaints about headaches, upper airway irritation, cough, chest pressure and sinus infection from users of these devices.

9.    Defendants ignored the complaints and other warning signs and failed to warn users, consumers, and the public at large about these hazards until April 26, 2021 and did not recall the affected devices until June 14, 2021.

10.    As part of the recall, Defendants stated that the potential risks of particulate exposure to users of these devices include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects.  The potential risks of chemical exposure due to off-gassing of PE-PUR Foam in these devices include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

11.    Philips recommended that patients using the recalled CPAP and Bi-Level PAP devices immediately discontinue using their devices and that patients using the recalled ventilators for life-sustaining therapy consult with their physicians regarding alternative ventilator options.

12.    Approximately 3-4 million devices were recalled as a result of the health risks associated with the PE-PUR foam.  The June 14, 2021 recall left millions of individuals without an immediate option for replacement of their breathing machines, leaving millions vulnerable to health condition that would naturally arise as a result of a lack of a safe and effective breathing device.  Defendants recall was timed to coincide with a launch of its next generation of DreamStation products, which Philips claims do not contain the same PE-PUR foam at issue, thereby leaving millions of individual with the one and only option of purchasing a new device from Philips, thus increasing its profits on the heels of a recall.

13.    Defendants designed, manufactured, marketed, advertised, distributed, and sold dangerous devices to consumers nationwide.

4

14.    By placing the Recalled Devices into the stream of commerce throughout the United States, Defendants misled consumers into thinking that the Recalled Devices were safe and effective for use.

15.    As a result of Defendants' deceptive and improper actions, Defendants received improper and unlawful monetary gain and benefit.

## PARTIES

**Plaintiff**

16.    Plaintiff Edward Haddix is a citizen of the State of West Virginia.

17.    During the applicable period, Plaintiff was (prescribed and/or used) Defendants' Dreamstation Auto CPAP machine, a Recalled device that contained PE-PUR sound abatement foam.

18.    Plaintiff purchased the Dreamstation Auto CPAP in approximately 2016.

19.    Plaintiff used the Dreamstation Auto CPAP from approximately 2016 to August 2021.

20.    In July 2021, Plaintiff was made aware that the device was subject to a recall due to the presence of a dangerous PE-PUR Foam that could cause him to suffer from adverse health effects, including, *inter alia*, cancer and organ failure. Plaintiff was advised to discontinue use of the devices. He was also advised to verify whether his device was subject to the recall by submitting the serial numbers for his device to an online database Philips established. Plaintiff received confirmation that his CPAP device was subject to recall.

21.    PE-PUR foam degrades and/or off-gasses particles, chemicals, and/or volatile organic compounds that are toxic and/or carcinogenic.  Plaintiff used the Dreamstation Auto CPAP machine for approximately five (5) years and ingested/inhaled these harmful particles,

chemicals and/or compounds as a result of degraded PE-PUR foam contained within the device due to Defendants' design. Plaintiff thus suffered cellular and genetic injury that creates and/or increases the risks that Plaintiff will develop cancer and other serious injuries and damages.

22.    Plaintiff has now incurred substantial expenses to replace the devices. In addition, Plaintiff has experienced chest tightness and respiratory irritants during his use of the Philips' CPAP machine. Since being notified of the recall, Plaintiff has experienced anxiety concerning the potential serious health risks he is facing from possible exposure to off-gassed or degraded PE-PUR Foam in the recalled device.

23.    Plaintiff demands a refund, a replacement with a no-affected device, costs for ongoing medical monitoring and treatment, and all other appropriate damages based on, *inter alia*, Defendants' breach of express warranty, breach of implied warranties, misrepresentations, omissions, and breaches of state consumer protection laws in connection with its manufacture, marketing and sales of devices containing PE-PUR Foam on behalf of himself and the proposed Classes.

**Defendants**

24.    Defendant Royal Philips is a Dutch multinational corporation with its principal place of business located in Amsterdam, Netherlands. Royal Philips is the parent company of the Philips Group of healthcare technology businesses, including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips holds directly or indirectly 100% of its subsidiaries Philips NA and Philips RS. Upon information and belief, Royal Philips controls Philips NA and Philips RS in the manufacturing, selling, distributing, and supplying of the recalled CPAP, Bi-Level PAP, and mechanical ventilator devices.

25.     Defendant Philips NA is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly-owned subsidiary of Royal Philips.

26.     Defendant Philips RS is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS is a wholly-owned subsidiary of Royal Philips. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.

## JURISDICTION AND VENUE

27.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) at least one member of the proposed class is a citizen of a state diverse from Defendants, and (4) the proposed class consists of more than 100 class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

28.     This Court has personal jurisdiction over Defendants because Defendants have sufficient minimum contacts in the State of West Virginia, and because Defendants have otherwise intentionally availed themselves of the markets within the State of West Virginia through their business activities. Defendants conduct substantial business in this District, and the events giving rise to Plaintiff's claims arise out of and relate to Defendants' contacts with this District.  The unlawful acts of Defendants have been directed at, targeted, and have had the effect of causing injury to persons residing in, located in, or doing business in this District, as well as throughout the United States.

29.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants transact business in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; because the Plaintiff resides in this District; and because the Defendants caused harm to Plaintiff and other class members residing in the District.

## FACTUAL ALLEGATIONS

30.     Continuous Positive Airway Pressure ("CPAP") therapy is a common nonsurgical treatment primarily used to treat sleep apnea. CPAP therapy typically involves the use of a hose and a nasal or facemask device that delivers constant and steady air pressure to an individual's throat to help individuals breathe.

31.     Sleep apnea is a common sleep disorder characterized by repeated interruptions in breathing throughout an individual's sleep cycle. These interruptions, called "apneas," are caused when the soft tissue in an individual's airway collapses. The airway collapse prevents oxygen from reaching the individual's lungs which can cause a buildup of carbon dioxide. If the individual's brain senses the buildup of carbon dioxide, it will briefly rouse the individual from sleep so that the individual's airway can reopen. Often these interruptions are so brief that the individual will not remember. Despite the brevity of the interruptions, the sleep cycle disruption caused by sleep apnea can dramatically impact a person's lifestyle, including negatively impacting energy, mental performance, and long-term health. CPAP therapy helps treat sleep apnea by preventing the person's airway from collapsing while breathing during sleep cycles, which can help prevent interruptions in breathing.

32.     Bi-Level Positive Airway Pressure ("BiPAP") therapy is a common alternative to CPAP therapy for treating sleep apnea. Similar to CPAP therapy, BiPAP therapy is nonsurgical

and involves the use of a nasal or facemask device to maintain air pressure in an individual's airway. BiPAP therapy is distinguishable from CPAP therapy, however, because Bi-Level PAP devices deliver two alternating levels—inspiratory and expiratory—of pressurized air into a person's airway, rather than the single continuous level of pressurized air delivered by a CPAP device. The inspiratory positive airway pressure assists a person as a breath is taken in. Conversely, the expiratory positive airway pressure is applied to allow a person to comfortably breathe out. Bi-Level PAP devices deliver one level of pressurize air (the inspiratory positive level) to assist as a person inhales, and another level (the expiratory level) as a person exhales.

33.    Patients commonly use CPAP or BiPAP devices to assist them in breathing on a daily or nightly basis.

34.    Mechanical ventilation is a treatment to help a person breathe when they find it difficult or are unable to breathe on their own, and is used to treat respiratory failure. Respiratory failure is a condition in which the patient has difficulty breathing and can be fatal. A mechanical ventilator pushes airflow into the patient's lungs to help them breathe. Mechanical ventilation may be invasive ventilation with a tube inserted into the patient's airway, performed in the intensive care unit in the hospital or a long-term institutional setting. Non-invasive ventilation can be used at home by people with respiratory difficulties.

35.    CPAP, BiPAP, mechanical ventilator devices are often fitted with foam made of polyurethane or PE-PUR for the purposes of quieting the motor of the machine. Polyurethane foam is a member of a family of polymers or plastics.

36.    Philips developed, marketed, and sold a variety of CPAP and Bi-Level PAP respirator devices and mechanical ventilators under its "Sleep & Respiratory Care" segment of its business designed to assist individuals with a number of sleep, breathing, and respiratory

conditions, including obstructive sleep apnea, central sleep apnea, complex sleep apnea syndrome, and Chronic Obstructive Pulmonary Disease (COPD), as well as to assist those individuals requiring invasive and non-invasive ventilators for acute and sub-acute hospital environments. Philips' CPAP and Bi-Level PAP respirator devices and its mechanical ventilators typically cost several hundred, if not thousands of dollars. Philips has sold millions of these devices in the United States.

37.     Defendants manufactured, marketed, distributed and sold CPAP and BiPAP Machines and mechanical ventilators. Defendants' 2020 Annual Report revealed that approximately 49% of total sales in the Connected Care line of business consisted of Sleep & Respiratory Care products, which in turn accounted for 28% of Defendants' overall sales of approximately €19.535 billion.

38.     Defendants' most popular CPAP and BiPAP machines are part of its "DreamStation" family, which includes devices such as the original DreamStation and the DreamStation Go.

39.     On April 13, 2021, Defendants announced the launch of next-generation devices from its DreamStation family, named DreamStation 2.

40.     On April 26, 2021, Defendants announced the existence of potential health hazards pertaining to its CPAP, BiPAP and ventilator devices related to the PEPUR sound abatement foam contained within the devices. More specifically, Defendants' announcement stated that it had determined from user reports and testing that there are possible risks to users related to the PE-PUR sound abatement foam, including "that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods such as ozone, and certain environmental conditions involving high humidity and temperature."

Defendants noted that the majority of the affected Devices were within the advised 5-year services life from its first-generation DreamStation family.

41.    On June 14, 2021 Defendants issued a recall of its devices which contain the PEPUR foam and stated as follows:

> To date, Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam. Despite a low complaint rate (0.03% in 2020), Philips determined based on testing that there are possible risks to users related to this type of foam. The risks include that the PEPUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals. The foam degradation may be exacerbated by use of unapproved cleaning methods, such as ozone, and high heat and high humidity environments may also contribute to foam degradation.
>
> Therefore, Philips has decided to voluntarily issue a recall notification to inform patients and customers of potential impacts on patient health.

42.    With respect to instructions for future use of the affected devices, Defendants stated as follows:

> Based on the latest analysis of potential health risks and out of an abundance of caution, the recall notification advises patients and customers to take the following actions: For patients using affected BiLevel PAP and CPAP devices: Discontinue use of your device and work with your physician or Durable Medical Equipment (DME) provider to determine the most appropriate options for continued treatment. To continue use of your device due to lack of alternatives, consult with your physician to determine if the benefit of continuing therapy with your device outweighs the risks identified in the recall notification.
>
> For patients using affected life-sustaining mechanical ventilator devices: Do not stop or alter your prescribed therapy until you have talked to your physician. Philips recognizes that alternate ventilator options for therapy may not exist or may be severely limited for patients who require a ventilator for life-sustaining therapy, or in cases where therapy disruption is unacceptable. In these situations, and at the discretion of the treating clinical team, the benefit of continued usage of these ventilator devices may outweigh the risks identified in the recall notification.
>
> **Possible health risks**

The company continues to monitor reports of potential safety issues as required by medical device regulations and laws in the markets in which it operates. To date, there have been no reports of death as a result of these issues. Philips has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, 1rntation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects. Philips has received no reports regarding patient impact related to chemical emissions.

43.    The June 14, 2021 announcement also contained a section titled "Clinical information for physicians" and further explained, with respect to injuries, that:

While there have been limited reports of headache, upper airway irritation, cough, chest pressure and sinus infection that may have been associated with the foam, based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment.

44.    The June 14, 2021 announcement a detailed the basis of Defendants' statements regarding the degradation of the PE-PUR foam. The first hazard identified by Defendants is exposure to degraded PE-PUR foam into multiple toxic chemicals, as follows:

Philips has determined from user reports and lab testing that under certain circumstances the foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user of its Continuous Positive Airway Pressure (CPAP), BiLevel Positive Airway Pressure (BiLevel PAP) and Mechanical Ventilator devices. The foam degradation may be exacerbated by environmental conditions of higher temperatures and humidity in certain regions. Unauthorized cleaning methods such as ozone may accelerate potential degradation. The absence of visible particles does not mean that foam breakdown has not already begun. Lab analysis of the degraded foam reveals the presence of potentially harmful chemicals including:

• Toluene Dian1ine
• Toluene Diisocyanate
• Diethylene glycol

45.     The June 14, 2021 announcement identified a second hazard related to the PE-PUR foam, as it pertains to VOCs, as follows:

> **Potential Hazard:** Lab testing performed for and by Philips has also identified the presence of VOCs which may be emitted from the sound abatement foam component of affected device(s). VOCs are emitted as gases from the foam included in the ePAP, BiLevel PAP and MV devices and may have short- and long term adverse health effects. Standard testing identified two compounds of concern (COCs) may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following:
>
> • Dimethyl Diazine
> • Phenol, 2,6-bis (1, 1-dimethylethyl)-4-(1-methylpropyl)-

46.     Defendants acknowledged in their June 14, 2021 announcement that VOCs may cause the following: irritation and airway inflammation, especially for individuals with underlying lung diseases or reduced cardiopulmonary reserve, and symptoms such as headache, dizziness, irritation of the eyes, nose, skin and/or respiratory tract, hypersensitive, nausea and/or vomiting, toxic and carcinogenic effects as well as adverse effects to the kidneys and liver.

47.     Defendants knew or should have known about the aforementioned health risks long before the June 14, 2021 recall of the affected CPAP, BiPAP and mechanical ventilator devices.  Defendants' own customers have lodged multiple complaints regarding the presence of black particles and/or persistent smell found within the Recalled Devices for many years.

48.     As a result of the health risks associated with the use of the Recalled Devices, together with Defendants' concealment of these risks from the date they were first reported to Defendants or discovered by Defendants through April 26, 2021, the Recalled Devices have been rendered completely worthless or, at the very least, have been substantially diminished in value.

49.     The lack of replacement devices leaves millions of individuals, who are already vulnerable due to their breathing conditions, without a safe and effective breathing device.

50.     A general shortage of available replacement machines further compounds the issues, as many are left without any viable options to replace a device that is needed on a nightly or daily basis for decreasing breathing difficulties and, for some, survival.

51.     Defendants' launch of its DreamStation 2 two weeks before the April 26, 2021 announcement of the issues regarding the first-generation devices PE-PUR foam degradation, reveals that Defendants not only knew well ahead of the June 14, 2021 recall regarding the health hazards posed by its first-generation devices, but reveals their position in seeking to profit from their own wrongdoing.

52.     Defendants' announcements on April 13, 2021, April 26, 2021 and June 14, 2021 reveal Defendants acknowledge their first-generation devices which contain PE-PUR foam are defective, unsafe, and not reasonably suited for their stated purpose. The Recalled Devices would not have been purchased by Plaintiff and class members had they been informed of the defects at the time of sale.

53.     Plaintiff and the class members have suffered economic injuries as a result of their purchase of the Recalled Devices.

54.     At no time prior to its Regulatory Update on April 26, 2021, did Philips disclose to purchasers or users of the Recalled Devices that the PE-PUR Foam contained therein may off-gas or degrade upon use. Similarly, prior to the Update, Philips did not disclose any health risks associated with use of the Recalled Devices.

55.     Defendants have not disclosed when they first discovered or received reports from users of their Sleep & Respiratory Care devices "regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)."

56.     At a minimum, as a result of user reports, Defendants were aware of the off-gassing and degradation of the PE-PUR Foam used in the Recalled Devices at some point prior to the recall, yet continued to manufacture and sell the Recalled Devices with such awareness. During this period, Defendants unreasonably and unjustly profited from the manufacture and sale of the Recalled Devices and unreasonably put users of the Recalled Devices at risk of development of serious adverse health effects, including organ failure and cancer.

## TOLLING

57.     Plaintiff and the Classes had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Recalled Devices.

58.     Neither Plaintiff nor any other members of the Classes, through the exercise of reasonable care, could have discovered the conduct by Philips alleged herein. Further, Plaintiff and members of the Classes did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

59.     By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiff and the members of the Classes.

60.     Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiff and members of the Classes. Plaintiff and the members of the Classes were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiff or members of the Classes should be tolled.

## CLASS ACTION ALLEGATIONS

61.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of himself and all other similarly situated as the following ascertainable Classes defined as:

**Class 1:** All individuals residing within the United States who purchased or leased a Recalled Device prior to April 26, 2021 who seek to replenish costs for the purchase, lease or replacement of the Recalled Devices.

**Class 2:** All individuals residing within the United States, who at the time a class is certified in this case, purchased or leased a Recalled Device prior to April 26, 2021 and seek medical monitoring for the serious health and medical conditions and injuries associated with the Recalled Devices.

62.     Plaintiff reserves the right to modify or refine the definitions of the Classes based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

63.     Excluded from the Class  are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants' and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendants or their parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class or Subclass; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiff and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

64. The definition of the Classes are unambiguous. Plaintiff is member of the Classes that he seeks to represent. Class members can be notified of the class action through publication and direct mailings to address lists maintained in the usual course of business by Defendant and its retail customers.

65. **Numerosity (Rule 23(a)(1))**. The Class members so numerous that joinder of individual members herein is impracticable. Approximately 3-4 million devices are affected by Philips' recall, indicating that the class is in the number of millions. While the precise number of Class members is unknown to Plaintiff; it is abundantly clear that the number greatly exceeds a number that would make joinder possible or feasible, particularly given Defendants' nationwide sales of its Recalled Devices.

66. **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

a. Whether the PE-PUR foam contained m Defendants' Recalled Devices degraded;

b. Whether Defendants representations and omissions, seen in their marketing labeling and other materials, were false and/or misleading and/or likely to deceive the public;

c. Whether Defendants conduct as set forth herein constitutes the violations of the laws asserted;

d. Whether Defendant violated consumer protection statutes and/or false advertising statutes and/ or state deceptive business practices statutes;

e. Whether express and/or implied warranties exist and whether Defendant breached those warranties;

f. Whether Defendant violated the common law of unjust enrichment; and

g. The nature and extent of damages and other remedies to which the conduct of Defendant entitles the Class members.

67. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the Class members. Similar or identical statutory and common law violations and deceptive business practices are involved. Individual questions, if any, pale by comparison to the numerous common questions that predominate.

68. The Class members have been damaged by Defendants' misconduct. The Class members have paid premium costs for Defendants' Recalled Devices, i.e. breathing machines which would not have been legally sold or purchased in the absence of Defendants' marketing campaigns and deceptive scheme.

69. The injuries sustained by the Class members flow, in each instance, from a common nucleus of operative facts - Defendants' misconduct. In each case Defendant marketed and sold the Recalled Devices by misleading, deceiving or otherwise omitting the truth to Plaintiff and the Class that the Recalled Devices were safe and effective for their marketed purposes.

70. **Typicality (Rule 23(a)(3))**. Plaintiff's claims are typical of the claims of the other members of the proposed Class. Plaintiff and members of the Class (as applicable) suffered injuries as a result of Defendants' wrongful conduct that is uniform across the Class.

71. **Adequacy (Rule 23(a)(4))**. Plaintiff's interests are aligned with the Class he seeks to represent. Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained competent counsel highly experienced in complex litigation and class actions and the types of claims at issue in this litigation, with the necessary

resources committed to protecting the interests of the Class. Plaintiff has no interest that is antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of the other members of the Class.

72.    **Superiority**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

73.    **Manageability.** This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

74.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

19

## BREACH OF EXPRESS WARRANTY
### (Individually and on behalf of the Class)

75.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

76.    Defendants are in the business of selling devices to consumers such as Plaintiffs and the members of the Class, including but not limited to CPAP and BiPAP machines and mechanical ventilators such as the kind sold to Plaintiff and the members of the Class.

77.    Defendants marketed and sold the Recalled Devices into the stream of commerce with the intent that the Recalled Devices would be purchased by Plaintiff and the Class.

78.    Defendants expressly warranted, advertised, and represented to Plaintiff and the Class that the Recalled Devices were safe and appropriate for human use. Defendants made these express warranties regarding the Recalled Devices' quality and fitness for use in writing through its website, advertisements, and marketing materials, and on the Recalled Devices' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiff and the Class entered into upon purchasing the Recalled Devices.

79.    Defendants' advertisements, warranties, representations, and omissions regarding health risks associated with the Recalled Devices, were made in connection with the sale of the Recalled Devices to Plaintiff and the Class. Plaintiff and the Class relied on Defendants' advertisements, warranties, representations, and omissions regarding the Recalled Devices in deciding whether to purchase and use the Recalled Devices.

80.    The above affirmations of fact were not couched as "belief' or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

81.    These affirmations of fact became part of the basis for the bargain and were material to Plaintiff and Class Members' transactions.

82.     The Recalled Devices do not conform to these express representations because they contain PE-PUR foam which can degrade into carcinogenic particles and/or chemicals,

83.     Defendant's Recalled Devices do not conform to the advertisements, warranties, representations, and omissions in that they are not safe, healthy, and appropriate for human use, and pose risks of serious injury and disease, including organ failure and cancer.

84.     Defendants therefore breached the express warranties by including PE-PUR foam that can degrade in the Devices sold to Plaintiff and the Class without properly notifying them of their inclusion in the Devices, and by placing Recalled Devices into the stream of commerce and selling them to consumers when their use posed health risks, had dangerous effects and were unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Philips. These associated health effects substantially impair the use, value, safety of the Recalled Devices, and render them worthless.

85.     Defendants were aware, or should have been aware, of the toxic or dangerous health effects of the use of the Recalled Devices, but nowhere on the package labeling or package inserts or on Philips' websites or other marketing materials did Philips warn Plaintiff and members of the Class that they were at risk of developing adverse health effects as a result of the dangerous PE-PUR Foam used in the Recalled Devices.

86.     The adverse health effects associated with use of the Recalled Devices existed when they left Philips' possession or control and were sold to Plaintiff and members of the Class. The dangers associated with use of the Recalled Devices were undiscoverable by Plaintiff and members of the Class at the time of purchase of the Recalled Devices.

87.     As manufacturers, marketers, advertisers, distributors and sellers of the Recalled Devices, Philips had exclusive knowledge and notice of the fact that the Recalled Devices did not conform to the affirmations of fact and promises.

88.     Within a reasonable time after it knew or should have known, Defendants did not change the Devices' labels to include harmful particles and/or chemicals from degrade PE-PUR foam.

89.     As a direct and proximate result of Philips' breaches of express warranty, Plaintiff and members of the Class suffered and/or will continue to be harmed and suffer economic loss in an amount to be proven at trial.

90.     Plaintiff and the Class members did rely on the express warranties of the Defendants herein.

91.     Defendant knew or should have known that, in fact, said representations and warranties were false, misleading and untrue.

92.     Defendants conduct breached its express warranties in violation of the following state express warranty laws, including:

    a. Code of Ala.§ 7-2-313;

    b. Alaska Stat. § 45.02.313;

    c. Ariz. Rev. Stat. Ann. § 47-2313;

    d. Ark. Code Ann. § 4-2-313;

    e. Cal. Comm. Code § 2313;

    f. Colo. Rev. St. § 4-2-313;

    g. Conn. Gen. Stat. Ann.§ 42a-2-313;

    h. 6 Del.§ C. 2-313;

i. D.C. Stat.§ 28:2-313;

j. Fla. Stat. § 672.313;

k. O.C.G.A. § 11-2-313;

l. Haw. Rev. Stat.§ 490:2-313;

m. Idaho Code§ 28-2-313

n. 810 L.L.C.S. 5/2-313;

o. Ind. Code§ 26-1-2-313;

p. Iowa Code § 554.2313;

q. Kansas Stat. Ann.§ 84-2-313;

r. K.R.S. § 355.2-313;

s. La. Civ. Code. Ann. Art. 2520;

t. 11 Maine Rev. Stat. Ann.§ 2-313;

u. Md. Commercial Law Code Ann. § 2-313;

v. Mass. Gen. Laws Ann. 106 § 2-313;

w. M.C.L.S. § 440.2313;

x. Minn. Stat. Ann. § 336.2-313;

y. Miss. Code Ann. § 75-2-313;

z. Missouri Rev. Stat. § 400.2-313;

aa. Mont. Code Ann. § 30-2-313;

bb. Neb. Rev. Stat.§ 2-313;

cc. Nev. Rev. Stat. §104.2313;

dd. N.H. Rev. Stat.§ 382-A:2-313;

ee. N.J. Stat. Ann. § 12A:2-313;

ff. N.M. Stat. Ann.§ 55-2-313;

gg. N.Y. U.C.C. Law§ 2-313;

hh. N.C. Gen. Stat. Ann. § 25-2-313;

ii. N.D. Cent. Code§ 41-02-30;

jj. O.R.C. Ann.§ 2-313;

kk. Okla. Stat. Ann. Tit. 12A, § 2-313;

ll. Or. Rev. Stat. § 72.3130;

mm. 13 Pa. Rev. Stat. § 72-3130;

nn. R.I. Stat.§ 6A-2-313;

oo. S.C. § 36-2-313;

pp. S.D. Cod. Laws.§ 57A-2-313;

qq. Tenn. Code Ann.§ 47-2-313;

rr. Tex. Bus. & Com. Code Ann. § 2.313;

ss. Ut. Code Ann.§ 70A-2-313;

tt. Va. Code Ann.§ 59.1-504.2;

uu. Vt. Stat. Ann. § 2-313;

vv. Wa. Ann.§ 62A.2-313;

ww. W. Va. Code§ 46-2-313;

xx. Wis. Stat.§ 402.313; and

yy. Wyo. Stat. § 34.1-2-313.

93.    The above statutes do not require privity of contract to recover for breach of express warranty.

94.     Within a reasonable time after they knew or should have known of such breach, Plaintiff, on behalf of himself and members of the Class, placed Defendants on notice thereof.

95.     As a direct and proximate result of the foregoing acts and/or omissions, Plaintiff and the Class members have suffered damages entitling them to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

<u>**SECOND CLAIM FOR RELIEF**</u>

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Individually and on behalf of the Class)**

96.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

97.     Defendants are in the business of selling Products to consumers such as Plaintiff and the members of the Class, including but not limited to CPAP and BiPAP machines and mechanical ventilators products of the kind sold to Plaintiffs and the members of the Class.

98.     Plaintiff and the members of the Class purchased Defendant's Products.

99.     At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed Products.

100.    At the time Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Products for use by Plaintiff and the Class members, Defendants knew of the use for which the Products were intended, and impliedly warranted the Products to be of merchantable quality.

101.    Defendants' representations and warranties were false, misleading, and inaccurate, in that the Devices were not of merchantable quality and were not safe for use as breathing devices because the CPAP, BiPAP and mechanical ventilator devices contained PE-

PUR foam that degraded, broke down, and /or "off-gassed" carcinogenic particles, chemicals and/or VOCs.

102.    Plaintiff and class members relied on said implied warranty of merchantability.

103.    Plaintiff and class members reasonably relied upon the skill and judgment of Defendants to whether the Devices were safe for use as non-invasive breathing Devices and were of merchantable quality.

104.    The Devices were injected into the stream of commerce by Defendants despite the fact that they were not safe and were expected to and did reach users, handlers, and persons coming into contact with said Devices without substantial change in the condition in which they were sold.

105.    Defendants breached the aforesaid implied warranties, as the Products were not fit for their intended purposes and uses as they contained PE-PUR foam that degraded and/or broke down into particles, chemicals and/or VOCs that are toxic and carcinogenic.

106.    As a direct and proximate result of the breach of said warranties, Plaintiff and the class members suffered and/or will continue to be harmed and suffer economic loss.

107.    Defendants conduct breached its implied warranties regarding the Recalled Devices under state implied warranty laws, including:

   a. Ark. Stat. § 7-2-314 and§ 7-2-315;

   b. Ak. St.§ 45.02.314 and§ 45.02.315;

   c. Cal. Comm. Code § 2314;

   d. Co. Rev. Stat.§ 4-2-314 and§ 4-2-315;

   e. 6 Del. C. § 2-314 and§ 2-315;

   f. D.C. Stat. § 28:2-314 and § 28:2-315;

26

g. Haw. Rev. Stat.§ 490:2-314 and§ 490:2-315;

h. Ind. Code§ 26-1-2-314 and§ 26-1-2-315;

i. Kan. Stat. Ann. § 50-639(b);

j. La. Civ. Code Ann. Art. 2524;

k. Maine Rev. Stat. Ann.§ 2-314 and§ 2-315;

l. Md. Com. Law Code Ann.§ 2-314 and§ 2-315;

m. Mass. Gen. Laws Ann. 106 § 2-314 and§ 2-315;

n. Mich. Comp. Laws Ann. § 440.2314 and§ 440.2315;

o. Minn. Stat. Ann.§ 336.2-314 and §336.2-315;

p. Miss. Code Ann.§ 75-2-314 and§ 75-2-315;

q. Mo. Rev. Stat.§ 400.2-314 and§ 400.2-315;

r. Mont. Code Ann.§ 30-2-314 and§ 30-2-315;

s. Neb. Rev. Stat. § 2-314 and § 2-315;

t. Nev. Rev. Stat.§ 104.2314 and§ 104.2315;

u. N.H. Stat. Ann.§ 382-A:2-314 and§ 382-A:2-315;

v. N.J. Stat. Ann.§ 12A:2-314 and§ 12A:2-315;

w. N.M. Stat. Ann.§ 55-2-314 and§ 55-2-315;

x. N.D. Stat.§ 41-02-31and§41-02-32;

y. Ohio Rev. Code Ann.§ 1302.27 and§ 1302.28;

z. Okla. Stat. Ann. tit. 12A, § 2-314 and§ 2-315;

aa. O.R.S. § 72.8020;

bb. Pa. Stat. Ann. tit. 13, § 2314 and §2315;

cc. S.C. § 36-2-314 and§ 36-2-315;

dd. S.D. Cod. Laws. § 57 A-2-314 and § 57 A-2-315;

ee. Tex. Bus. & Com. Code Ann.§ 2.314 and§ 2.315;

ff. Ut. Code Ann. § 70A-2-314 and § 70A-2-3 1 5;

gg. Va. Code Ann. § 8.2-314 and§ 8.2-315;

hh. W. Va. Code§ 46-2-314 and§ 46-2-315; and

ii. Wyo. Stat.§ 34.1-2-314 and§ 34.1-2-315.

108.    These states do not require privity of contract to recover for breach of implied warranty.

109.    Within a reasonable time after they knew or should have known of such breach, Plaintiff, on behalf of himself and members of the Class, placed Defendants on notice thereof.

110.    As a direct and proximate result of the foregoing acts and/or omissions, Plaintiff and the Class members have suffered damages, and are entitled to compensatory damages, punitive damages, costs and reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF

**MEDICAL MONITORING CLAIMS**
**(Individually and ON BEHALF OF Alabama, California, Colorado, District of Columbia, Florida, Indiana, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nevada, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Utah, and West Virginia Subclass)**

111.    Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

112.    As a proximate result of Defendants' acts and omissions, the Class is at an increased risk of developing respiratory illnesses, damage to multiple organs, and cancer above the normal base-level risk.

28

113.    As alleged above, Defendants' Recalled Devices contained PE-PUR foam that degrades and/or "off-gasses" certain particles and chemicals which are carcinogenic and harmful to humans.

114.    The Class Members may not develop cancer for many years.

115.    Upon information and belief, and based upon investigations now made public, the Class is at an increased risk as they were exposed to a carcinogen for extended periods of time.

116.    The Class Members are at an increased risk of cancer as they were exposed to the foam contained in Defendants' Recalled Devices, which degrades and/or "off-gasses" harmful particles and chemicals in quantities and over periods of time sufficient to establish an exposure level that is considered to be hazardous to health, and that is considered to be sufficient to cause cancer and/or increase the risk of developing cancer.

117.    The exposure was caused solely and proximately by Defendants' failure to adequately manufacture their Recalled Devices; their failure to address discrepancies during quality control testing; their material misrepresentations, false statements, and other deceptive practices in continuing to claim that their Recalled Devices were safe for use over extended periods of time to prevent cancer.

118.    Defendants had a duty to the Class Members to disclose to the Class Members any defect, contamination, impurity or other potential health hazard known or discoverable by Defendants; and to ensure that their Recalled Devices were safe, reliable, and non-hazardous for use as non-invasive air pressure Devices.

119.    As alleged above, Defendants' own acts and omissions resulted in an increased risk of developing cancer for all members of the Class. Cancer is a serious disease-causing life

threatening illness. Technology, analytical tools, test and/or monitoring procedures exist and are readily available to provide for the testing and early detection of cancer in patients.

120.    Plaintiff seek, on behalf of himself and the Class Members whom they seek to represent, injunctive and monetary relief, including compensatory damages for, and the creation of a fund to adequately finance the costs of, medical monitoring procedures (1) to notify and alert all people exposed to chemicals as a result of the degradation of the foam contained within the Recalled Devices as aforesaid of their exposure and the potential consequences, (2) to provide for necessary testing and screening including but not limited to blood tests, physical examinations, imaging, colonoscopies, endoscopies, and other similar methods for examination, biopsies, pathologic, histologic, and oncologic evaluations, oncologic, histologic, surgical and other necessary medical consultations, (3) to provide for necessary medical and surgical procedures for diagnosis and treatment, (4) to provide for all necessary evaluations and treatment, attorneys' fees, costs, interest, and such further relief as the Court deems equitable and just.

## PRAYER FOR RELIEF

121.    WHEREFORE, Plaintiff and the Class members request that the Court enter an order or judgment against Defendant including the following:

122.    Certification of the action as a Class Action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, and appointment of Plaintiff as Class Representatives and his counsel of record as Class counsel;

123.    Damages in the amount of monies paid for the Recalled Devices;

124.    Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

125. Pre-judgment and post-judgment interest on such monetary relief;

126. The costs of bringing this suit, including reasonable attorneys' fees; and

127. All other relief to which Plaintiff and members of the Class may be entitled at law or in equity.


## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

DATED: August 27, 2021

Respectfully submitted,


*/s/ Harry G. Deitzler*_____
Harry G. Deitzler, Esq., WV State Bar #981
James C. Peterson, Esq., WV State Bar # 2880
Hill, Peterson, Carper, Bee & Deitzler, PLLC
Northgate Business Park
500 Tracy Way
Charleston, WV 25311
Tel: (800) 822-5667
Fax: (304) 345-1519
Email: HGDeitzler@hpcbd.com
Email: JCPeterson@hpcbd.com


-and-

*/s/ Anthony J. Majestro*_____
Anthony J. Majestro, Esq., WV State Bar #5165
Powell & Majestro, PLLC
405 Capitol Street, Suite P-1200
Charleston, WV 25301
Telephone #: 304.346.2889
Facsimile #: 304.346.2895
Email: amajestro@powellmajestro.com

-and-

_/s/ Christopher A. Seeger_____
Christopher A. Seeger
(*Pro Hac Vice to be Submitted*)
David R. Buchanan
(*Pro Hac Vice to be Submitted*)
Caleb A. Seeley
(*Pro Hac Vice to be Submitted*)
Humaira Safdar
(*Pro Hac Vice to be Submitted*)
Seeger Weiss LLP
55 Challenger Road
Ridgefield Park, NJ 07660
Tel.: (973) 639-9100
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
cseeley@seegerweiss.com
hsafdar@seegerweiss.com